IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

J.R. WILKERSON a.k.a.
ADONAI M. EL-SHADDAI

        Plaintiff,                      No. CIV S-05-2482 LKK DAD P

   vs.

D.L. RUNNELS, et al.

        Defendants.               FINDINGS AND RECOMMENDATIONS

_____/

        Plaintiff is a state prisoner proceeding pro se and in forma pauperis with an action under 42 U.S.C. § 1983. In his amended complaint plaintiff asserts the following claims for relief based on two events which allegedly took place while he was incarcerated at High Desert State Prison (HDSP): (1) his reassignment from a 270°- design building to a 180°- design building, which he claims was an adverse placement in a "higher security" facility, and (2) being assaulted in a holding cell at the Correctional Treatment Center (CTC) by an inmate who was a member of a gang that was hostile toward plaintiff because plaintiff is African-American. Plaintiff has also claimed that prison officials obstructed his access to the prison grievance process in violation of his rights under the First Amendment.

/////

1  The court screened the amended complaint as required by 28 U.S.C. § 1915A and found that plaintiff's allegation of a First Amendment violation did not state a cognizable claim. (See Docket No. 18.) The court ordered service on defendants Runnels, Baker and McCulley as to plaintiff's remaining claims: (1) that plaintiff was denied notice and a hearing on his reassignment to the 180°- design facility, in violation of his rights to due process and equal protection (Claim 1); (2) that plaintiff's placement in an allegedly dangerous environment violated his rights under the Fifth, Eighth and Fourteenth Amendments (Claim 3); and (3) that plaintiff's placement in the holding cell with a member of a gang hostile toward plaintiff was deliberately indifferent to a substantial risk to plaintiff's safety, in violation of the Eighth Amendment (Claim 4).[1] Defendants now move for summary judgment in their favor as to all of plaintiff's claims.

I. Factual Background

The evidence presented to the court on summary judgment is as follows. Plaintiff is serving a sentence of life with the possibility of parole. At all times relevant to his complaint, plaintiff was a Level IV inmate and had a placement score of 254. Defendants' Undisputed Fact (DUF) 5 (Docket 38-2).

A. Plaintiff's Housing Assignments

When plaintiff arrived at HDSP, he and several other inmates were housed in a 180°-design facility on the prison's D-Yard because there were no beds available in the 270°- design facility on B-Yard. DUF 8. Approximately two months later, he was moved to the 270°-

---

[1] The court's screening order did not address Claim 5 of the amended complaint, wherein plaintiff vaguely alleges he was denied certain privileges afforded other inmates under California Admin. Code tit. 15, § 3044(c). That regulation defines work privileges for California inmates. Plaintiff avers his denial of privileges under the regulation violated the Equal Protection Clause. He does not state any facts in support of the claim, nor is there any legal basis for such a claim under the Equal Protection Clause. None of the facts pled in the amended complaint plausibly implicates the Equal Protection Clause in any way. Therefore, the court will recommend that any claims alleged under the Equal Protection Clause be dismissed. Ashcroft v. Iqbal, ___U.S.___, ___, 129 S. Ct. 1937, 1949 (2009). Likewise, none of the facts pled implicate the Fifth Amendment in any way. Those claims too should be dismissed.

design facility, where he stayed for approximately one month, until he was reassigned again to the 180°-design facility on D-Yard. DUF 9-10. D-Yard is split into an upper and lower level. When plaintiff was reassigned to the 180°-design facility on D-Yard, he was placed on the upper level. DUF 10.

It is not disputed that the reason for moving plaintiff back to the 180°-design facility on D-Yard was to accommodate housing needs and was not disciplinary in nature. DUF 11. It is also undisputed that, while assigned to Upper D-Yard, plaintiff was able to participate in religious programs and received the same diet. DUF 14-15. The cells on Upper D-Yard are larger than the cells in the 270°-degree design on B-Yard. DUF 15. Plaintiff had a cell mate on both housing yards. Id.

Plaintiff alleges in his amended complaint that there was a "war" between gang-affiliated African-American inmates and the Northern Mexican prison gang on the Lower D-Yard. Amended Complaint ¶ 9. Lower D-Yard was on lockdown because of the hostilities, but Upper D-Yard, where plaintiff was housed, was not on lockdown. DUF 19-20. At all relevant times, there were no Northern Mexican gang members on Upper D-Yard. DUF 21.

There is only one CTC for all inmates at HDSP. DUF 23.

B. Plaintiff's Assault in the CTC

On January 6, 2005, plaintiff was escorted to the CTC to receive new eyeglasses. DUF 24. He was placed in holding cell number 2 (Tank 2) at the CTC with other inmates from Upper D-Yard. DUF 27. Defendants Baker and McCulley, both correctional officers, were assigned to the CTC that day.

According to defendant Baker's affidavit, he briefly left the CTC to dispose of some trash. See Declaration of B. Baker in Support of Summary Judgment ¶ 4 (Docket No. 38-3). When he returned, he found an unattended inmate standing in the holding area. Id. at ¶ 5. Baker states it was the first time he had seen the inmate. Id. He also declares that he did not know the inmate, nor was he aware of the inmate's affiliation with the Northern Mexican prison

gang. Id. Baker states he "asked the inmate what yard he was from. He told me he was from D-yard. He did not say anything else. The inmate did not appear to be affiliated with any gang. The inmate was not acting threatening or belligerent, and no words were spoken between him and the Plaintiff." Id. at ¶¶ 6-7.

Baker states that "[i]t was the practice to place inmates from the same yard in the same holding cell." Id. at ¶ 8. He opened the door to the holding cell where plaintiff sat, and, "[w]ithout any warning, the inmate took one step into the holding tank and struck Plaintiff (who was seated near the door) once on the side of the head. Because I was within arm's reach of the attacking inmate, I immediately subdued him, and there was no further assault." Id. at ¶¶ 8-9. Baker states that plaintiff had a red mark on the side of his head but appeared to have no serious injuries stemming from the attack. Id. at ¶ 10.

For his part, defendant McCulley submits an affidavit stating he also did not know the hostile inmate nor that the inmate was affiliated with the Northern Mexican gang. Declaration of C. McCulley in Support of Summary Judgment ¶ 4 (Docket No. 38-7). Defendant McCulley states he was not immediately present during the incident and did not see plaintiff get assaulted, nor did he instruct Baker to place the inmate in Tank 2 with plaintiff. Id. at ¶¶ 5-6, 9.

III.  Plaintiff's Allegations

Plaintiff disputes Baker's and McCulley's accounts of how the assault occurred. See Plaintiff's Response to DUF 31-39, 48-50 (Docket No. 41). Plaintiff contends that defendant Baker, along with defendant McCulley, brought the hostile inmate to Tank 2 and "knowingly and deliberately staged the attack on Plaintiff by a Northern California Mexican American gang member." Am. Compl. ¶18-20. In his opposition to the motion for summary judgment, plaintiff alleges that the defendants "staged this attack for their entertainment." Opp'n at 2. Plaintiff states that the defendants knew about the "war" between African-American gang members and the Northern Mexican gang and that they "knew that because the inmate had arrived separately
/////

4

1  from black inmates from D-Yard that he was a Northern Mexican gang member and should have
2  remained separate from black inmates." Id.

3  Plaintiff states that he defended himself and "several punches were thrown within
4  15 to 20 seconds." Plaintiff's Response to DUF 38. Plaintiff disputes defendants' statement that
5  he only had a red mark on his head and no serious injuries, stating he "suffered a swollen area on
6  the right side of my face, eye and neck and back pains." Plaintiff's Declaration in Support of
7  Opposition, ¶ 13 (Docket No. 42-1). The parties do not dispute that, after the incident, plaintiff
8  was "examined and cleaned up," that he did not require stitches or x-rays, and that he was given
9  some pain medication. DUF 42-44.

10  Finally, plaintiff alleges a connection between his housing assignment and the
11  assault, claiming that "as a result of Defendant Runnels' unlawful transfer of plaintiff from a
12  270° design facility to a 180° design facility plaintiff was a victim of an assault by a Northern
13  California Mexican American gang member." Am. Compl. ¶ 21.

14  II.  Analysis

15  Summary judgment is appropriate when the movant demonstrates that there exists
16  "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a
17  matter of law." Fed. R. Civ. P. 56(c).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

22  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). "[W]here the
23  nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary
24  judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers
25  to interrogatories, and admissions on file.'" Id. Indeed, summary judgment should be entered,
26  after adequate time for discovery and upon motion, against a party who fails to make a showing

5

sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. See id. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). The opposing party must also demonstrate that the dispute is genuine, i.e., that the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. See Anderson, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

### A.  Plaintiff's Due Process Claim

Plaintiff avers he was entitled under the Due Process Clause of the Fourteenth Amendment to notice and a hearing before "his involuntary adverse transfer to "D" facility, a more restrictive program." Am. Compl. ¶ 22.

The Due Process Clause protects against the deprivation of liberty without due process of law. See Wolff v. McDonnell, 418 U.S. 539, 556 (1974). In order to invoke the protection of the Due Process Clause, a plaintiff must first establish the existence of a liberty interest for which the protection is sought. Generally, liberty interests may arise from the Due Process Clause itself or from state law. See Wilkinson v. Austin, 545 U.S. 209, 222 (2005). The Due Process Clause does not confer on prisoners a liberty interest in avoiding more adverse conditions of confinement. See Wilkinson, 545 U.S. at 221. A court determines whether a liberty interest is created by a state prison regulation or policy by focusing on the nature of the deprivation that it effects. See Sandin v. Connor, 515 U.S. 472, 481-84 (1995). Liberty interests against adverse conditions of confinement are a narrow category, limited only to the freedom

from any restraint that "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." <u>Sandin</u>, 515 U.S. at 484.

Plaintiff invokes no freestanding liberty interest emanating from the Due Process Clause itself. Instead, he points to state regulations that entitle inmates to notice and a hearing under certain preconditions. The regulation governing plaintiff's housing assignment states that "[a]n inmate with a placement score of 52 and above shall be placed in a Level IV facility." Cal. Admin. Code tit. 15, § 3375.1(a)(4). "Level IV" in this context refers to the security level of a facility. California law requires 72 hours' notice and a hearing before an inmate's "[i]nvoluntary transfer to a higher security level institution/facility, which is not consistent with the inmate's placement score[.]" Cal. Admin. Code tit. 15, § 3375(f)(1)(A). However, an "involuntary transfer. . . not consistent with the inmate's placement score" did not happen here. Plaintiff does not dispute his placement score was 254, nor does he meaningfully dispute that the 180°-design facility and the 270°-design facility are both Level IV facilities. <u>See</u> Declaration of R. Dreith in Support of Summary Judgment, ¶ 3 (Docket No. 38-5).

Instead, plaintiff submits a list of determinants (published, presumably, by the California Department of Corrections and Rehabilitation) to support his contention that he was classified as a prisoner who belonged only in the 270°- design facility and was prohibited from placement in the supposedly higher security 180°- design facility. In fact, the list submitted by plaintiff shows the opposite: it defines who is restricted from a 270°- design facility (e.g., validated gang members), but the list does not exclude any class of inmate from assignments to a 180°- design facility. Therefore, the list upon which he relies with respect to this claim simply does not apply to plaintiff. Indeed, nothing in the evidence submitted on summary judgment supports plaintiff's suggestion that, as a proper candidate for housing in a 270°- design facility, he could not be transferred to the 180°- design unit without a change in his Level IV classification. To the contrary, the record establishes that both of the units are Level IV facilities.
/////

Under California law, plaintiff's move to the 180°- design facility was not a reassignment into adverse conditions. However, that does not end the inquiry. The court must also inquire into the actual conditions at the 180°- design facility to determine conclusively whether plaintiff had any liberty interest in avoiding his placement there.

In <u>Myron v. Terhune</u>, 476 F.3d 716 (9th Cir. 2007), the court rejected a California prisoner's argument that his classification at and assignment to a Level IV prison rather than a Level III prison implicated a federal liberty interest. Citing the decision in <u>Sandin</u>, the court held that the prisoner's classification at Level IV

> does not, on the record before us, present "an atypical and significant hardship." There is no showing that the conditions at level IV differ significantly from those "imposed upon inmates in administrative segregation and protective custody" – a distinction <u>Sandin</u> held to be relevant. There is also no showing that the conditions at level IV differ significantly from those at level III.

<u>Mylon</u>, 476 F.3d at 718 (citations omitted). Under the decisions in <u>Sandin</u> and <u>Mylon</u>, then, plaintiff must show that his assignment to the 180°- design facility on D-Yard presents a significantly adverse and atypical set of conditions from assignment to the 270°- design on th e B-Yard.

In this regard, plaintiff does not contend the allowances for exercise and religious activity on D-Yard are substantially different from those on B-Yard, and he concedes the cells on D-Yard are bigger. Still, at his deposition, plaintiff insisted the 180°- degree facility is "a higher level of security." Excerpts of Plaintiff's Deposition, pp. 34-35 (Docket No. 39-1). Plaintiff explained in his deposition testimony that the design of the entire facility – more walls and security gates – created a more restricted environment (indeed, more prison-like), but he did not point to anything inherent in D-Yard that could be construed as an "atypical or significant hardship" outside ordinary prison life. <u>Id.</u> at 35-37.

Plaintiff instead points to the "war" between black gangs and the Northern Hispanic gang on Lower D-Yard and argues that by being assigned to Upper D-Yard he was

9

placed "in a dangerous environment that posed a substantial and pervasive threat of violence to his safety which resulted in his being a victim of an assault[.]" Opp'n at 3. However, as defendants rightly point out, Lower D-Yard was on lockdown because of the hostilities, but Upper D-Yard, where plaintiff was housed, was not on lockdown. DUF 19-20. Plaintiff does not dispute that there were no Northern Mexican gang members on Upper D-Yard. DUF 21. Moreover, he has not presented any evidence or describe any incident on Upper D-Yard to support his contention that conditions there were pervasively threatening and dangerous. The only incident plaintiff mentions and presents evidence about was his assault at the CTC.

Ultimately, plaintiff has presented no evidence connecting his assignment to Upper D-Yard to the assault. His due process claim fails because the single threatening incident that plaintiff alleges "resulted" from his placement on Upper D-Yard happened outside D-Yard, at the only CTC at the prison where plaintiff was confined. His housing status did not have any adverse effect on plaintiff once he was at CTC. The evidence before the court establishes that plaintiff was placed in the correct holding cell at CTC – i.e., with other Upper D-Yard inmates. Moreover, plaintiff's own allegations of what actually happened at the CTC sever any possible factual connection between his placement on Upper D-Yard and the assault in question. According to plaintiff's account of events, it was the concerted, intentional actions of defendants Baker and McCulley to place him in close quarters with a member of the Northern Hispanic gang that created the only dangerous environment on record in this case. If that allegation is true, the assault would have happened no matter what yard plaintiff had been assigned to and came from.

Thus, no evidence before the court suggests that plaintiff's assignment to the 180°- design facility presented an atypical or significant hardship such that a claim of a federal liberty interest could lie. Defendants are therefore entitled to summary judgment in their favor as to plaintiff's claim that his right to due process was violated.

/////

/////

B. <u>Plaintiff's Eighth Amendment Claims</u>

Plaintiff alleges two violations of the Eighth Amendment's protection against cruel and unusual punishment: (1) he claims defendant Runnels, as warden at HDSP, transferred him to D-Yard and thus placed him into "a dangerous environment which posed a substantial and pervasive threat of violence," and (2) he claims that defendants Baker and McCulley "acted with deliberate indifference for the very purpose of inflicting unnecessary and wanton pain[.]" Am. Compl., ¶¶ 24-25.

"Prison officials have a duty. . . to protect prisoners from violence at the hands of other prisoners." <u>Farmer v. Brennan</u>, 511 U.S. 825, 833 (1994). The failure of prison officials to protect inmates from attacks by other inmates may rise to level of an Eighth Amendment violation when: (1) the deprivation is "objectively, sufficiently serious" and (2) the prison officials had a sufficiently culpable state of mind, acting with deliberate indifference. <u>Hearn v. Terhune</u>, 413 F.3d 1036, 1040 (9th Cir.2005) (citing <u>Farmer</u>). "[D]eliberate indifference entails something more than mere negligence . . . [but] is satisfied by something less that acts or omissions for the very purpose of causing harm or with knowledge that harm will result." <u>Farmer</u>, 511 U.S. at 835.

1. <u>Defendant Runnels</u>

First, for the reasons explained above, no evidence before the court supports plaintiff's contention that the 180°- degree facility was an environment so dangerous that his placement there was an "objectively, sufficiently serious" deprivation under the Eighth Amendment. Second, plaintiff has presented no evidence that defendant Runnels personally ordered plaintiff's assignment to the facility. According to Correctional Counselor Dreith's affidavit, the warden of a prison is not involved in decisions to move an inmate from one general population yard to another within his placement level. Dreith Declaration, ¶ 3.

Plaintiff attempts to rebut this evidence of defendant Runnels' non-involvement by stating his assumption that Runnels, as warden, must have been involved or knew about the

11

transfer.  However, defendant Runnels' status as warden, without more, cannot serve as the basis for liability here.  Supervisory officials cannot be held vicariously liable for the actions of their subordinates in a § 1983 action.  Hansen v. Black, 885 F.2d 642, 646 (9th Cir. 1989).  A supervisor can be held liable for a violation of constitutional rights even if he or she was not personally involved in the actions which led to the violation if the supervisor implemented a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation.  Id.  Participation sufficient to incur liability may involve the setting in motion of acts which cause others to inflict constitutional injury.  Johnson v. Duffy, 588 F.2d 740, 743-44 (9th Cir.1978).  Here, though, plaintiff has presented no evidence of any such participation by Runnels.  Accordingly, defendant Runnels is entitled to summary judgment in his favor with respect to plaintiff's Eighth Amendment claim.

### 2.  Defendants Baker and McCulley

The parties' central point of dispute regarding the liability of defendants Baker and McCulley, the two correctional officers who were at the CTC, is over the defendants' mental state – i.e., the subjective prong of the Eighth Amendment claim.[2]  On this issue plaintiff must point to facts showing more than mere negligence by Baker or McCulley in placing the Northern Hispanic gang member in the holding cell with plaintiff.  "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Farmer, 511 U.S. at 837.  Furthermore, a prison official "who actually knew of a substantial risk to inmate health or safety may be found free from liability if [he] responded reasonably to the risk, even if the harm ultimately was not averted."  Id. at 844.

Plaintiff has presented no evidence to support his "belie[f] that Defendants Baker and McCulley staged this attack for their own entertainment."  Plaintiff's Decl. ¶ 14.  Both

---

[2] Defendants do not contend that the assault and the resulting injury fall short of a "sufficiently serious" deprivation required to meet the first, objective prong of an Eighth Amendment claim.

defendants have stated under penalty of perjury that they did not know at the time if the inmate who attacked plaintiff was a gang affiliate, and plaintiff testified in deposition that when the inmate arrived at the holding cell, "we thought he was a Southerner." Depo. Excerpts, 52:5-6. Since there is no evidence before the court that either defendant in fact knew that the inmate was a Northern Mexican gang member, there is also no evidence that either of them knew of the risk of an assault upon plaintiff posed by the other inmate. Insofar as defendants never contradict plaintiff's repeated mention of the "war" between rival racial gangs and the impact of those tensions on non-affiliated inmates, there is evidence that defendants <u>should</u> have known to inquire and clarify what risk the inmate in question posed to plaintiff. However, that evidence only supports a theory of negligence against the defendants. Without any evidence or testimony about some outward identifier that marked the inmate as a Northern Mexican gang member or some evidence at least suggesting that defendants were so aware before defendant Baker placed the inmate in the holding cell with plaintiff, there is no genuine issue of material fact on either defendant's culpable state of mind.

      Moreover, under the decision in <u>Farmer</u> it is relevant that defendant Baker intervened and helped stop the attack relatively quickly. Although the agreed-upon duration of the fight – fifteen or twenty seconds – can in many instances be long enough to inflict substantial harm, in this case it is undisputed that defendant Baker never so much as closed the cell door behind the inmate. Indeed, plaintiff's account of the attack does not contradict defendant Baker's statement that he "was within arm's reach of the attacking inmate" when the fight began. Baker Decl. ¶ 9. This short span of time between the other inmate's entrance into the cell and the end of the attack does not support plaintiff's subjective belief that the defendants staged a fight for their own entertainment.

      It is also undisputed that defendant McCulley was not even in sight of the holding cell when the attack began. McCulley Declaration, ¶¶ 5-6 (Docket No. 38-7). Plaintiff testified at his deposition that the fight ended when "they came over with the spray. . . telling us to get

13

back, get back." Depo. Excerpts 53:12-13.  Although not specifically stated, the court infers that plaintiff's reference to "they" means defendant McCulley also helped end the fight.  As with evidence of defendant Baker's quick response to end the attack, these facts about defendant McCulley's involvement also contradict plaintiff's claim of a staged attack.  Indeed plaintiff has pointed to no evidence before the court suggesting that defendant McCulley even conversed with defendant Baker about plaintiff or the hostile inmate before the attack occurred, much less conspired with him to instigate violence between the two inmates.

In sum, there is no evidence before the court establishing a genuine issue of material fact with respect to plaintiff's Eighth Amendment claims against defendants Baker and McCulley.  Rather, based upon the evidence submitted with respect to the pending motion for summary judgment, no rational trier of fact could find for plaintiff on his Eighth Amendment claim.  See Matsushita, 475 U.S. at 587.  Therefore, defendants Baker and McCulley are entitled to summary judgment in their favor with respect to this claim.

## CONCLUSION

Accordingly, IT IS HEREBY RECOMMENDED that the motion for summary judgment (Docket No. 38) be granted and this case closed.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within fourteen days after service of the objections.  The parties are

/////

/////

/////

/////

1 advised that failure to file objections within the specified time may waive the right to appeal the
2 District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).
3 DATED: March 10, 2011.

_____
DALE A. DROZD
UNITED STATES MAGISTRATE JUDGE

hm
wilk2482.57